## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 26 2018, 6:04 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Renee M. Ortega
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| N.L.,<br>*Appellant-Respondent,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Petitioner.* | July 26, 2018<br><br>Court of Appeals Case No.<br>45A05-1712-JV-2879<br><br>Appeal from the Lake Superior Court<br><br>The Honorable Thomas P. Stefaniak, Jr., Judge<br><br>The Honorable Robert G. Vann, Magistrate<br><br>Trial Court Cause No.<br>45D06-1502-JD-137 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Respondent, N.L., appeals the juvenile court's order, modifying his probation and ordering him to be a ward of the Department of Correction (DOC).

We affirm.

# ISSUES

N.L. raises two issues, which we restate as:

(1) Whether the juvenile court's dispositional order complied with the statutory requirements; and

(2) Whether the juvenile court abused its discretion when modifying N.L.'s placement from probation to wardship at the DOC.

# FACTS AND PROCEDURAL HISTORY

On April 25, 2015, at age fourteen, N.L. incurred his first delinquency referral after he was charged with battery resulting in bodily injury, a Class A misdemeanor if committed by an adult. While at school, N.L. had grabbed another student by the neck and choked him to the point the student lost consciousness and fell to the ground, hitting his head on the classroom floor. N.L. entered into an agreement with the State, in which he admitted to the battery and was placed on Intensive Probation Level 2. On July 16, 2015, after making improvements in his behavior, N.L.'s probation was modified and lowered to Intensive Probation Level 1.

[5] Almost immediately after modifying his probation, N.L. began to accumulate unreported absences at school. Despite beginning to "revert[] back to some of his previous behaviors in the home setting," N.L. remained "in compliance with services[.]" (Appellant's App. Vol. II, p. 89). After October 2015, N.L. began attending day treatment rather than regular high school. However, "shortly after his enrollment [the day treatment facility] discharged [N.L.] alleging he was threatening students and incited overall several fights in one day." (Appellant's App. Vol. II, p. 100). Attempts to place N.L. at another day treatment facility failed "due to [an] alleged gang affiliation." (Appellant's App. Vol. II, p. 100). Eventually, N.L. participated in services through Choices and enrolled in another day treatment program. On February 17, 2016, N.L. was again discharged from the day treatment program because he had engaged in a fight with another student. Despite being ordered by probation to attend yet another day treatment facility, N.L. refused to do so. As of April 1, 2016, "[t]hree out of four programs [N.L.] has attended have reported physical aggression." (Appellant's App. Vol. II, p. 144).

[6] When not in school, N.L. "appears to be enthused with gang activities[,]" and his "gang involvement has placed himself and [his] family in grave danger." (Appellant's App. Vol. II, pp. 134, 135). In fact, N.L.'s "enthusiasm and participation with gang related activities through Facebook has prompt[ed] his current residency to be targeted by gang members." (Appellant's App. Vol. II, pp. 134-35). When asked about gang membership, N.L. admitted to being affiliated with the Vice Lords gang.

[7] On April 7, 2016, the juvenile court conducted a hearing on the State's petition to modify N.L.'s probation after violating his terms of probation by being expelled from the day treatment program for fighting. N.L. admitted to the violation and was ordered to remain detained in the county's detention facility pending disposition. Despite probation's search to secure a placement for N.L., only one residential treatment facility was willing to accept him but could not for a period of multiple months. At the end of May 2016, the juvenile court released N.L. from detention to live with his mother and placed him back on Intensive Probation Level 2.

[8] Within a month, the Indiana Department of Child Services (DCS) was called to N.L.'s mother's house. Upon their arrival, N.L.'s mother advised them that her boyfriend had broken up a fight between N.L. and a girl. Afterwards, N.L. threatened mother's boyfriend, yelling "I'll kill you where the fuck you stand" and that when the boyfriend was asleep, N.L. would "slit his fucking throat." (Appellant's App. Vol. II, p. 181). Shortly after this incident, N.L. absconded from mother's residence. A verified petition to detain N.L. was granted but he was not detained until nearly a month later. During his intake, N.L. reported that he had first gone to Texas for less than a week and then spent some time in Indianapolis before returning to northwest Indiana.

[9] On July 21, 2016, the State filed another petition for modification for violating his conditions of probation by absconding. N.L. admitted to the allegation, and on August 4, 2016, the juvenile court ordered N.L. committed to the DOC for six months. In a report to the juvenile court upon N.L.'s release, the probation

officer reported that N.L. had accumulated "12 major disciplinary conduct reports while at the DOC." (Appellant's App. Vol. III, p. 23). The day after he was released, N.L. informed his probation officer that he had "gotten 'dummy high'" and that he was "still high" the following morning. (Appellant's App. Vol. III, p. 26). In the month between his release and his July 2017 hearing, N.L. again fled the state for 10 days while telling his mother and probation officer that he had secured employment for which he needed to live with his father. Also, N.L. posted photographs of himself holding firearms on social media. During this time, "it appear[ed] that [N.L.'s] behaviors [] escalated since his release from the" DOC. (Appellant's App. Vol. III, p. 26).

[10] On July 25, 2017, finding that N.L. was a danger to himself and the community, the juvenile court placed N.L. back on Intensive Probation Level 2, mandated him to wear a location monitor, and ordered him detained at Alternative House. On August 8, 2017, N.L. was released from Alternative House and resumed living with his mother. Although his behavior improved for several weeks, N.L. again began posting photos of himself brandishing firearms on social media. He sent a selfie holding a firearm to another juvenile, threatening "Biitch iima smoke yo ass just like liil John." (Appellant's App. Vol. III, p. 78) (spelling and capitalization unaltered).

[11] By the end of September 2017, N.L.'s therapist observed

> The adolescent is not only dangerous[,] he is deeply and
> profoundly mentally ill. By his own admission he has committed
> or was directly involved in the murder of two people in the past

and exhibits no reservations with regards to harming not only the youth cited above but even members of his own family. . . It is to be remembered there is still a $4000.00 street bounty on [N.L.'s] head because he robbed a known drug dealer in Hammond, IN. several months ago . . . [N.L.] constitutes a viable danger to others and to himself and should be removed from the home in order to preclude any further unnecessary bloodshed, this must be initiated as expeditiously as is possible for the safety of [N.L.'s] family and the public at large.

(Appellant's App. Vol. III, p. 72). On September 20, 2017, the State petitioned the juvenile court to modify N.L.'s probation, and the juvenile court ordered N.L. detained pending the hearing.

[12] In anticipation of the modification hearing set for October 26, 2017, N.L.'s probation officer submitted a detailed hearing report, describing the progress of the case. The report included a narrative of the progression of N.L.'s behavior while on probation, but also entailed diagnoses resulting from a psychological evaluation, the diagnostic criteria associated with the diagnoses, and noted that N.L.'s parents "ha[d] complied with the Order of Participation." (Appellant's App. Vol. II, p. 32).

[13] At the modification hearing, N.L.'s mother, primary therapist, case manager, and probation officer were present. During the proceeding, N.L.'s mother advised the juvenile court that her son "needs mental help." (Transcript p. 9). She informed the juvenile court that she will not allow N.L. to return home as he is putting the "other kids in jeopardy." (Tr. p. 10). N.L.'s therapist recommended placement at the DOC, where the psychiatric services and the

educational caveat [sic] could be easily met." (Tr. p. 10). N.L.'s probation officer noted that no residential placement would accept N.L. and that because of his violent provocation of gang members on social media, "if he has to go to the DOC to keep him safe and keep him from getting killed on the streets, then that's the recommendation that I will make." (Tr. p. 16). At the conclusion of the hearing, the juvenile court took its disposition under advisement to allow probation to investigate one other possible placement. On November 9, 2017, the juvenile court issued its dispositional order, ordering N.L. to be a ward of the DOC.

[14] N.L. now appeals. Additional facts will be provided if necessary.

# DISCUSSION AND DECISION

### I. *Standard of Review*

[15] When a person under the age of eighteen commits an act that would be a crime if committed by an adult, the person is adjudicated a 'delinquent child' and the juvenile court issues a dispositional decree providing for placement, sanctions, and treatment of the child. *R.J.G. v. State*, 902 N.E.2d 804, 806 (Ind. 2009). Dispositional decrees are intended to promote rehabilitation, consistent with the expressed legislative intent to "ensure that children within the juvenile system are treated as persons in need of care, protection, treatment, and rehabilitation." Ind. Code § 31-10-2-1(5). Thus, the juvenile court is given a myriad of alternatives and is accorded great latitude and flexibility to allow the

disposition that "best fits the unique and varying circumstances of each child's problems." *A.A.Q. v. State*, 958 N.E.2d 808, 813-14 (Ind. Ct. App. 2011).

[16] The choice of the specific disposition of a juvenile adjudicated a delinquent child is a matter within the sound discretion of the juvenile court, subject to certain statutory considerations. *D.A. v. State*, 967 N.E.2d 59, 64 (Ind. Ct. App. 2012). Indiana Code section 31-37-18-6 provides that the juvenile court shall choose a disposition that is "in the least restrictive . . . and most appropriate setting available," consistent with the safety of the community and the best interest of the child. We will reverse only if there has been an abuse of discretion, which occurs when the juvenile court's action is clearly erroneous and against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual inferences that can be drawn therefrom. *D.A.*, 967 N.E.2d at 64.

## II. *Dispositional Order*

[17] N.L. contends that the juvenile court's order did not conform with the statutory requirements contained in Indiana Code section 31-37-18-9(a). Complaining that the court's order is "rote and merely statutory in form," N.L. asserts that the disposition is insufficient, fails to contain tailored written findings and conclusions, and omits the reasons for the disposition. (Appellant's Br. p. 8).

[18] When ordering an order modifying a juvenile disposition, the court must comply with the requirements governing dispositional orders. *See* Ind. Code § 31-37-22-3(c). Indiana Code section 31-37-38-9(a) requires a dispositional

decree to include "written findings and conclusions," as well as "specific findings" as to

> (1) The needs of the child for care, treatment, rehabilitation, or placement.
> (2) The need for participation by the parent, guardian, or custodian in the plan of care for the child.
> (3) Efforts made, if the child is removed from the child's parent, guardian, or custodian, to:
> (A) Prevent the child's removal from; or
> (B) Reunite the child with;
> The child's parent, guardian, or custodian.
> (4) Family services that were offered and provided to:
> (A) The child; or
> (B) The child's parent, guardian, or custodian.
> (5) The court's reasons for the disposition.
> (6) Whether the child is a dual status child under [I.C. §] 31-41.

The statute allows the juvenile court to "incorporate a finding or conclusion from a dispositional report as a written finding or conclusion upon the record in the court's dispositional decree. I.C. § 31-37-18-9(c).

[19] At the outset, the juvenile court's order noted that "[t]he statements in the Probation Officer's Report and all attachments are adopted as findings, including any and all statements of reasonable efforts to provide services, and are incorporated by reference herein." (Appellant's App. Vol. II, p. 27). Subsequently, the order addressed all the requirements imposed by statute. It spoke to N.L.'s best interest in being removed from the home because remaining there "would be contrary to the welfare of the child" and "because the home environment is unable to meet" N.L.'s "basic needs." (Appellant's App. Vol. II, p. 27). It noted that the parents had complied with the Order of

Participation. The order further found that "[e]fforts made to provide family services did not prevent removal of the child(ren) because the family services were refused or ineffective[,]" and the probation officer's report contained extensive documentation of the unsuccessful placements and treatments provided to N.L. (Appellant's App. Vol. II, p. 27). The probation officer's report explained the justification for the DOC disposition referring to N.L.'s escalating behavior, his past violent threats, his absconding from his mother's home, and his history of expulsion from academic and treatment programs. While the order fails to include a specific finding as to N.L.'s dual status, the record evidences that a dual status team was convened in July of 2017, recommending that the juvenile court should solely proceed with delinquency proceedings.

[20] N.L. points to *K.A. v. State*, 775 N.E.2d 382 (Ind. Ct. App. 2002), *trans. denied*, in support of his argument that the probation officer's report cannot be used to constitute specific findings. However, as pointed out by the State, *K.A.* was decided in 2002 when the statute governing dispositional orders did not contain the language permitting the juvenile court to incorporate the findings of a dispositional report.[1]

[21] Accordingly, the Probation Officer's Hearing Report, as incorporated in the juvenile court's order, together with the court's findings, comply with the

---

[1] The current version of I.C. § 31-37-18-9 became effective in 2006. *See* Pub. L. 146-2006, S.E.C. 56.

statutory requirements of I.C. § 31-37-18-9(a). The incorporated documents, together with the court's findings, extensively describe N.L.'s prior placements, behavioral problems, attempts at treatment, and recommend a specific course of action based on these facts. Therefore, the juvenile court did not abuse its discretion when entering its disposition.

### III. *DOC Wardship*

[22] N.L. also disputes the severity of the juvenile court's disposition to the DOC. As the current cause is N.L.'s first juvenile adjudication, N.L. maintains that this second referral to the DOC is more punitive in nature than rehabilitative.

[23] Without question, I.C. § 31-37-18-6 requires the juvenile court to select the least restrictive placement in most situations. However, the statute contains language which reveals that under certain circumstances a more restrictive placement might be appropriate. That is, the statute requires placement in the least restrictive setting only "[i]f consistent with the safety of the community and the best interest of the child." I.C. § 31-37-18-6. Thus, the statute recognizes that in certain situations the best interest of the child is better served by a more restrictive placement. *See Madaras v. State*, 425 N.E.2d 670, 672 (Ind. Ct. App. 1981) ("[W]hile the juvenile code creates a presumption in favor of disposing of juvenile matters using the least severe disposition available to the court which will serve the needs of the case, the code explicitly recognizes that in some instances commitment may be in the best interests of the child and society in general.") (citation omitted); *M.R. v. State*, 605 N.E.2d 204, 208 (Ind.

Ct. App. 1992) (noting that while commitment to the Indiana Boys School "should be resorted to only if less severe dispositions are inadequate, there are times when such commitment is in the best interests of the juvenile and society in general."). "In some instances, confinement may be one of the most effective rehabilitative techniques available" when a juvenile is exposed to the type of placement he would encounter were he to continue with his poor behavior. *Madaras*, 425 N.E.2d at 672.

[24] The juvenile court did not abuse its discretion by ordering N.L. to be placed at the DOC. While we agree that this is N.L.'s first juvenile adjudication, given N.L.'s history, previous failed treatment attempts, and escalating behavior, the juvenile court's dispositional alternatives had become limited. He had already been placed once at the DOC—during which time he incurred 12 major disciplinary reports. When on probation, N.L.'s behavior became increasingly more threatening, ranging from posting photos of himself brandishing weapons on social media, to hurling threats to his mother's boyfriend, and getting into physical fights. He had been expelled from all previous treatment programs and is yet to successfully complete any court-imposed treatment. Several treatment programs have refused to admit him due to his escalating conduct and his self-proclaimed gang association. His mother has now declined to have N.L. reside in the family home in order to safeguard the other children. He has absconded from probation for a significant time and removed his tracking monitor. N.L.'s therapist and probation officer recommended placement at the DOC where he could be provided with the necessary rehabilitative services.

Accordingly, based on N.L.'s history and to safeguard the community, we refuse to disturb the juvenile court's disposition, ordering N.L. to the only facility that is still willing to admit him.

# CONCLUSION

Based on the foregoing, we hold that the juvenile court did not abuse its discretion by ordering N.L.'s placement at the DOC.

Affirmed.

May, J. and Mathias, J. concur